[Civil No. 2997. Filed March 2, 1933.]

[19 Pac. (2d) 672.]

In the Matter of the Petition of WAYNE HUBBS, Treasurer of the State of Arizona, for Special Letters of Administration on the Estate of THOMAS HIGGINS, Deceased. THE HIGGINS ESTATE, a Corporation, and MARGARET A. KEARNEY, Appellants, v. WAYNE HUBBS, Treasurer of the State of Arizona, Appellee.

Messrs. Ellinwood & Ross, Mr. John Mason Ross, Mr. John E. Sanders and Mr. James S. Casey, for Appellants.

Mr. K. Berry Peterson, former Attorney General, and Mr. Charles L. Strouss, Special Counsel Inheritance Tax Collector, for Appellee.

McALISTER, J.—This appeal involves the validity of an inheritance tax on a transfer of real property in this state and owned at the time by a resident of California, one Thomas Higgins. The superior court held the transfer taxable and determined the amount of the tax, and it is this order, as well as that denying respondent's application for a rehearing, that this court is asked to review.

In the early 80's, the record discloses, Thomas Higgins arrived in Arizona and became in succession a prospector, a miner and a mine operator. He located a number of claims in the Warren District of Cochise county and sold many of them to the large operating companies in and around Bisbee. As a result of his years of efforts in this line of work he accumulated a substantial fortune and in 1902 took up his residence in Los Angeles, California, where in the succeeding years he invested rather heavily in city real estate.

In 1914 he organized under the laws of that state a corporation known as "The Higgins Estate," hereinafter referred to as the corporation, with a capital stock of 100,000 shares of the par value of $10 each, and deeded to it a large portion of his California property, which in the judgment of those connected with the corporation made its assets worth around two and one-half million dollars and gave its stock a cash value in excess of $25 a share. With the exception of a very few shares, the stock was issued to Thomas Higgins as consideration for the property he conveyed to the corporation, but within a short time thereafter, being unmarried and without

lineal descendants, he began to make gifts of this stock to his relatives, the sons and daughters, or their issue, of two brothers, one of whom, John Higgins, resided in Ireland and the other, Bartholomew Higgins, in Australia, and before two years had passed he had given them the entire 100,000 shares. He did not, however, deliver it to them but placed it in escrow with the president of the corporation and directed in each escrow agreement, which was signed by the donee designated therein, that it should not be delivered before 1935, and that none of it should, prior to this date, be sold, transferred, assigned, pledged or hypothecated to any person other than a stockholder, the purpose being to keep the stock in the possession and control of the family.

Among the properties he did not convey to the corporation at that time was a group of ten patented mining claims located in the Warren District of Cochise county, this state, known as the Higgins Mine, which he had owned for years, even before moving to California. He was working it profitably through leases when the corporation was organized in 1914 and doubtless felt that, due to his many years of experience in the mining business, he could operate it to better advantage than could the corporation, none of whose directors or stockholders were mining people. But, whatever may have been his reason for not then conveying it, along with the other property, he did do so about three years later. The record discloses that on September 24th of that year he wrote the corporation a letter in which he inclosed two checks signed by himself for the aggregate sum of $150,000 and a deed conveying to it the ten patented mining claims composing the Higgins group and at its close stated that he was willing to take, as consideration for the deed and checks inclosed therewith, 30,000 shares of the capital stock of the cor-

poration and a life estate in the above-described mining claims. The original 100,000 shares had, as just stated, been issued and were then outstanding; hence, it was necessary that its capital stock be increased 30,000 shares before this offer could be accepted. However, after considering the proposition two or three days the corporation accepted it on September 28, 1917, retained the deed and the checks, reconveyed to Thomas Higgins immediately a life estate in the mine and issued to him, or rather to persons nominated by him, in January following the 30,000 shares of stock. Those he named as transferees of this additional stock were the identical persons he had given the original 100,000 shares to, except one John J. Higgins, a son of the brother in Ireland, who became the recipient of 4,000 shares, and the terms under which he directed it transferred to them were likewise the same as those governing the gifts of that stock.

He continued to operate the mine until his death on March 15, 1920, but after his passing the corporation itself worked it until October of that year, when, due to the fact that the war price for copper was no longer obtainable, it decided to and did cease operations. However, in May, 1922, it gave the Phelps-Dodge Corporation an option to purchase the mine for a consideration of $1,250,000, and on July 3d following this option was exercised and by February 1, 1924, the last installment of the purchase price had been paid and the deed delivered.

No steps were taken by anyone up to January, 1924, to have the estate of Thomas Higgins in Arizona probated, so in that month Wayne Hubbs, the State Treasurer, filed a petition in the superior court of Cochise county asking that he be appointed special administrator of the estate for the purpose of collecting the inheritance tax due the state as a result

of the transfer of the Higgins Mine to the corporation. From an order holding the transfer taxable and fixing the value of the property of the estate of Thomas Higgins in Arizona subject to inheritance tax to be $1,127,484.25 and determining the amount of the tax due thereon to be $66,849.05 with interest at six per cent. from March 15, 1920, and directing its payment, the Higgins Estate and Margaret A. Kearney, a surviving niece of Thomas Higgins, who answered the petition by demurring thereto, by objecting to the jurisdiction of the court and by filing a plea in bar of the proceeding, appeal.

The fourteen errors assigned raise first the controlling proposition in the case, and that is the taxability of the transfer of the Higgins Mine to the corporation. It is the contention of appellants that the transfer was purely a commercial transaction in which adequate consideration passed and, therefore, was not taxable under the inheritance tax laws of this state which tax only transfers testamentary in character. Appellee upon the other hand takes the position, as did the trial court, that the transfer, though in form a commercial transaction, was in reality a testamentary disposition and, therefore, taxable. If appellants' contention is correct they are entitled to a reversal and a discussion of any other question involved in the appeal is unnecessary; but if it is not and the transfer is subject to a tax, it will then become necessary to determine what valuation upon the mine should have been used as a basis for the tax,—that at the time of the transfer or that at the time of the death of Thomas Higgins. And whichever is held to be the correct one the further question remains, whether the evidence is such that the court could have ascertained from it the proper valuation.

The inheritance tax statute in force when the transfer of the Higgins Mine to the corporation was made and also when the grantor, Thomas Higgins, died, paragraph 4995, Revised Statutes of 1913 (Civ. Code), reads as follows:

"All property within the jurisdiction of this state, and any interest therein, whether belonging to the inhabitants of this state or not, and whether tangible or intangible, which shall pass . . . by deed, grant, bargain, sale, or gift, made in contemplation of the death of the grantor, or bargainor, or intended to take effect in possession or enjoyment after the death of the grantor, bargainor, or donor to any person or persons, or to any body, or bodies, politic or corporate, in trust or otherwise, or by reason whereof any person, or body politic or corporate, shall become beneficially entitled, in possession or expectation, to any property or income thereof, shall be, and is subject to a tax at the rate specified in the next section, to be paid to the state treasurer for the use of the state. . . . "

It will be observed that this section taxes every transfer of property located within the state when made in contemplation of death, or intended to take effect in possession or enjoyment after the death of the grantor, whether the property passes by deed, grant, sale, or gift, and it is clear that Thomas Higgins intended that the corporation should come into possession and enjoyment of the Higgins Mine after his death and not before. While the deed delivered by him conveyed the absolute fee, it, together with the checks for $150,000, was forwarded to be accepted and retained by the corporation only upon condition that it reconvey to him a life estate in the mine, which was done, and these two deeds constituted one transaction, being the same in effect as though Thomas Higgins had in one instrument transferred the fee to the mine and reserved therein a life estate to himself. *In re Dobson's Estate,* 73 Misc. 170,

132 N. Y. Supp. 472; *Reish, Admr.,* v. *Commonwealth,* 106 Pa. 521; *In re Russell's Estate,* 104 N. J. Eq. 578, 146 Atl. 361. Whether the deed of Higgins was made in contemplation of death as this term is used in paragraph 4995 is immaterial, since the correctness of the alternative thereof, namely, that possession and enjoyment of the mine were postponed until after his death, is without question. *In re Oppenheimer's Estate,* 75 Mont. 186, 243 Pac. 589, 44 A. L. R. 1470.

Such being the facts, nothing further was required to bring the transfer within the language of paragraph 4995, but appellants contend that though this be true to hold it taxable violates the spirit and purpose of the act, for the reason that adequate consideration for the vested remainder in the mine and the $150,000 in cash, namely, the 30,000 shares of stock in the corporation, passed to Higgins at the time of the transfer and that this had the effect of constituting the transaction a commercial one and, hence, of removing any possibility of its being considered as testamentary in character. While, it is true, the language of paragraph 4995 imposing the tax is broad enough to include transfers of property made even with adequate consideration, yet both the weight of authority and reason point to the conclusion that such a result was not intended. The purpose of the statute was not to impose an inheritance tax upon transfers of property made in the ordinary course of business and for an adequate, valuable consideration, but upon those made by deed, grant, bargain, sale or gift, when these instruments are intended to and do accomplish what a will would have brought about, that is, pass property to another "to take effect in possession or enjoyment after the death of the grantor." *In re Wadsworth's Estate,* 100 Misc. 439, 166 N. Y. Supp. 716; *In re Thomp-*

*son's Estate,* 196 Iowa 721, 195 N. W. 250; *In re Reynolds' Estate,* 169 Cal. 600, 147 Pac. 268; *Hagerty* v. *State ex rel. Dyer,* 55 Ohio St. 613, 45 N. E. 1046; *In re Wheeler's Estate,* 119 Neb. (Stoddart) 344, 228 N. W. 861; *In re Kraft's Estate,* (N. J. Prerog.) 103 N. J. Eq. 543, 143 Atl. 764; *Blair* v. *Herold,* (C. C.) 150 Fed. 199; *Herold* v. *Blair,* (C. C. A.) 158 Fed. 804; *In re Orvis' Estate,* 223 N. Y. 1, 119 N. E. 88, 3 A. L. R. 1636. The word "deed," as used in this paragraph, means a conveyance intended as a gift and does not refer to such an instrument if made in the ordinary course of business for a valuable consideration (In *Re Wadsworth's Estate, supra*), and the word "sale," whose meaning in this connection is to be determined by the application of the maxim, " 'Noscitur a sociis,' . . . includes only transactions which, though in form sales, are in fact gifts." *Hagerty* v. *State ex rel. Dyer, supra.* In *Re Orvis' Estate, supra,* the Court of Appeals uses this language:

"The Legislature did not intend that a purchaser who had paid full value for the property transferred should directly or indirectly pay the tax besides. . . . The statute was not intended to restrict or burden the right of persons to transfer property in all legitimate ways and for all the usual and manifold purposes and objects of trade, commerce, and purchase, or of voluntary transfers or gifts not made in contemplation of the death of the transferor or intended to take effect in possession or enjoyment after such death. It was intended to tax all transfers which are accomplished by will, the intestate laws of this state, and those made or incepted prior to the death of the transferor in contemplation of or intended to take effect in possession or enjoyment after his death which are in their nature and character instruments or sources of bounty or benefaction and which can be classed as similar in nature and effect with transfers by wills or the intestate laws, because they accomplish a transfer of property, donative in

effect, under circumstances which impress on it the characteristics of a disposition made at the time of the transferor's death.''

It is not necessary that the words, ''made without valuable and adequate consideration,'' appear in the law before it may be said the transfer is not subject to the inheritance tax. The Supreme Court of California in *Reynolds' Estate, supra,* held that the addition of this language to the law of that state in 1911 clarified but did not change the law theretofore existing in that jurisdiction, since it had been long and uniformly held there that transfers made upon a valuable and adequate consideration were not within the purview of the act. The legislature added practically the same language to the law of this state in 1922, subsection 3, section 1, chapter 26, Session Laws of that year, and its only effect was, the same as in California, merely to clarify, not to change the pre-existing law.

The question, therefore, presents itself whether the 30,000 shares of stock in ''The Higgins Estate'' constituted consideration for the remainder interest in the mine and the $150,000 cash, and, if so, whether it was adequate. It is clear from the record that in organizing the corporation and deeding to it a portion of his California holdings in exchange for its 100,000 shares of capital stock which he transferred to his relatives that Thomas Higgins was carrying out a plan conceived by him, or someone for him, that would enable him to keep his property in such form that his nephews and nieces, whom he greatly desired to lift ''to the plane he thought they should occupy'' and especially to give ''a good education,'' would have the possession and full enjoyment of it after his death and some benefit from it while he lived. That this was the purpose that actuated him in bringing this family corporation into being is

shown by the further fact that instead of delivering this 30,000 shares of stock to them he placed it in escrow with the president of the corporation and provided in the escrow agreement that it should not be sold, assigned or hypothecated, except to another stockholder, before January 1, 1935, and that it should remain in escrow until that date. By following this procedure he was able to transform certain of his California holdings into assets of the corporation and make the entire capital stock of that corporation the property of his nephews and nieces, and though the possession and full enjoyment of the stock were postponed by the escrow agreement some twenty years from that date, yet the income from it during this time was to be enjoyed by them.

For some reason, however, he did not care to part at that time with either the title to or the possession and enjoyment of the Higgins Mine but desired to and did retain and operate it himself, though some three years and four months later, that is, in September, 1917, he did, we have seen, transfer a vested remainder in it and $150,000 cash to the corporation, but upon condition that the latter issue him in return 30,000 shares of its capital stock. And very soon after the corporation accepted this offer he directed that the stock be issued not to him but to the same persons, with one exception, the first 100,000 shares had been transferred to and under the same restrictions. The effect of this transaction, it is clear, was to give the corporation ownership of the remainder interest in the mine but deny it possession and enjoyment thereof during his lifetime and to make his relatives owners of the stock but also deny them the possession and enjoyment of it for the same period. While, it is true, the agreement provided that the stock should remain in escrow only until January 1, 1935, in consequence of which there might have been

a possibility of its going into possession of his relatives before his death, yet it must be remembered that in all probability seventeen years in the future meant to him, a man then seventy-three years of age and suffering from diabetes, "after death." His life expectancy was only a fraction over seven years; hence, in fixing the date the escrow period would end ten years beyond this he undoubtedly intended that the transfer of the 30,000 shares of stock, no more than the transfer of the mine, should take effect either in possession or enjoyment prior to his death. No other inference can reasonably be drawn from the situation.

Such being the motive that prompted the transfer of the mine, it is not apparent how the testamentary character of the transaction could have been affected by the 30,000 shares of stock, whether it had a value of $10, $20 or $30 a share. In demanding the stock in exchange and ordering it issued to his relatives, instead of conveying the mine directly to them, it is clear that his purpose was to pass this particular property, along with his California holdings, to them at his death through the medium of the corporation. But why he desired to accomplish this through the instrumentality of additional stock rather than through their ownership of the original 100,000 shares is not plain. The only effect the new stock could have had, other, perhaps, than to give the transfer of the mine the appearance of an ordinary business transaction, instead of a testamentary disposition, was to reduce the value of each share of stock and probably change the proportion of the shares held by some of the relatives. If it could be inferred from the facts that Thomas Higgins demanded the stock in order that he might enjoy the income from it himself, sell it for value, or do anything with it in fact that would manifest a purpose incon-

sistent with the effectuation of the end he had in mind when he created the corporation, it could be plausibly argued that it was intended as a consideration for the mine, but since it is perfectly plain that he requested it in order that he might make a gift of *it,* in place of the *mine itself,* to his relatives, there is no escape from the conclusion that it was not a consideration at all but merely a medium or, as the trial court termed it, ''vehicle,'' through which he distributed his property to his heirs at his death and, therefore, that it was wholly ineffective as a means of depriving the transfer of the mine of its testamentary character.

The same is true, of course, of the $150,000 which, in addition to the mine, it is claimed, the 30,000 shares of stock paid for, since it is clear that it, the same as the mine, was a gift to his relatives through the medium of the corporation. Giving it at that particular time was undoubtedly prompted by the fact that a foreclosure of a trust deed against some of the corporate holdings for about the same amount was then being threatened and, according to the testimony, could have been consummated in California without resorting to a judicial proceeding and with no equity of redemption left in the corporation.

To say that Thomas Higgins, whose controlling purpose in forming the family corporation was to provide a method by which he could pass his property to his relatives at his death and permit them to enjoy some benefit from a portion of it during his lifetime, demanded from those relatives nearly one-fourth of the capital stock of that corporation as a consideration for the transfer to them through it of a mine he desired them to possess and enjoy after his death is equivalent to holding that he required the corporation to purchase property he had created it to accept as a gift and, it would appear, for no other

purpose than the mere privilege of returning it to those from whom he took it, an object wholly foreign to the end sought by Thomas Higgins in the creation of the corporation.

We are clearly of the view, therefore, that the transfer of the mine by Thomas Higgins was in reality a testamentary disposition of that property to his nephews and nieces through the medium of the corporation and that it comes within the purview of the inheritance tax law of this state.

Inasmuch, therefore, as it conclusively appears that the transfer of the mine was taxable, the question arises whether in calculating the tax due thereon the value when the transfer was made, or that when the grantor died, should be used as a basis. Appellants urge most strenuously that the value at the time the deed was delivered in September, 1917, is the proper one for the reason that title passed at that time, and under paragraph 4995, *supra,* it is the passing of title which creates the vested right to possession that is taxed and not the property itself, and in support of this view they cite several cases, but paragraphs 4997 and 5016 of the Civil Code of 1913, reading as follows, lead, we think, to a different conclusion, and they must be considered in connection with paragraph 4995:

"4997. All taxes imposed by this chapter shall take effect at and accrue upon the death of the decedent, or donor, and shall be due and payable at the expiration of twelve months from such death except as otherwise provided in this chapter. . . . ''

"5016. Every inheritance, devise, bequest, legacy, or gift, upon which a tax is imposed under this chapter, shall be appraised at its full and true value immediately upon the death of the decedent, or as soon thereafter as may be practicable. . . . ''

While it is true that it is the transfer, or right of succession, that is taxed and not the property itself,

yet it must be remembered that the value of the transfer can only be determined by correctly valuing the property transferred and the language of these two paragraphs unmistakably provides that every gift (of property) must be appraised immediately upon the death of the decedent and also that the tax imposed on that gift shall take effect and accrue at the same time. The fact that under the provisions of paragraph 5016 the transfer of the mine, though it vested in September, 1917, could not have been appraised and under paragraph 4997 the tax imposed thereon could not have taken effect or accrued prior to the death of Higgins, indicates also that the value of the property at the time of appraisal and the accrual of the tax imposed thereon was the one intended. While neither of these two sections state *in haec verba* as of what date the value shall be fixed, their plain import is that the person who succeeds to the rights of the decedent in relation to certain property should pay on the value of the property to which he succeeds and not on its value two, four, six or any number of years prior thereto, when he owned only the right to come into possession and enjoyment of it, or what might be left of it, at some future date. *In re Stevens' Will,* 177 Wis. 500, 188 N. W. 484. In *State* v. *Pabst,* 139 Wis. 561, 121 N. W. 351, the court in discussing the proposition said:

"The context of the law expresses as its purpose and object that the tax shall be imposed on the transfer at the time of the death of the decedent and rest as a lien on the property so transferred until paid. . . . This portion of the law does not operate to postpone the imposition of the tax on the transfer beyond the time of the death of the transferor, for, as we have seen, the tax comes into existence at the time of the death of the decedent. . . . The tax is imposed at the time of the devolution of the property, which is at the time of the transferor's death.''

In discussing the effect of the provision requiring the appraisement of a transfer of property which "was not made by death, but *inter vivos* and in contemplation of death only," to be "made immediately after the death of the decedent," the court in *Re Miller's Estate,* 184 Cal. 674, 195 Pac. 413, 16 A. L. R. 694, said:

"There is no declaration in the statute as to what shall be the rule when the dates are not the same; i. e., when a taxable transfer is made prior to the death of the transferor. The statute, however, does contain a provision which closely approaches a declaration that the valuation of future, contingent, or limited estates, created by the transfer, shall be as of the date of death. Such estates were created by the transfer here involved. . . . We think it fairly certain, therefore, that when the statute provides that in such cases as the present the appraisal is to be made immediately after the death of the transferor, it contemplates and requires that the appraisal be on the basis of the actual date of his death, and therefore, of necessity, as of that date."

Appellants contend, however, that this rule was in effect set aside, or at least confined to estates classed as future, contingent, or limited by the holding in the later case of *Chambers* v. *Lamb,* 186 Cal. 261, 199 Pac. 33, in which the court stated that the inheritance tax on "transfers in contemplation of death" is based on the value at the time of the transfer and not on that at the time of the death of the transferor. But in this case the grantor, William D. Lamb, executed and delivered the deed which carried with it full possession and enjoyment of the property at that time, not after his death. "In the instant case," the court said, "it is stipulated that full title, control and enjoyment passed to the grantee in 1909, at the time of the delivery of the deed." To require the grantee, Elizabeth Lamb, to pay the tax

on the value of the property as of the date she became the owner and went into the possession and full enjoyment thereof was clearly correct, because she paid on that to which she succeeded.

To hold, upon the other hand, that the value at the time of the transfer is the proper one means that in those instances in which the property greatly decreases in value following that date the donee would be required to pay on something he had never owned or enjoyed (that is, all above its value then), while in those cases in which its value increases, as well as those in which there is no change at all, he would pay on that which becomes his and no more; and necessarily the state would collect in the first class of cases on property that had never gone into his possession and enjoyment, but in the second only on that which had reached him. Clearly it was not the purpose of the inheritance tax law to compel the donee of a gift to pay a tax on something he never possessed or enjoyed. If the transfer, for instance, were of property having a value at the time of $20,000 and some years later, when the grantor dies and the donee's possession becomes effective, this had decreased to $10,000, it would hardly be in agreement with the aim of the inheritance tax law to apply to the smaller value the schedule the law prescribes for the larger. The property transferred itself bears the burden of the tax imposed upon it, and we think it was the purpose of this law to require of it what its value at the time it is fixed calls for, no more, no less.

Notwithstanding the tax accrued in March, 1920, when the grantor died, and the appraisement of the property for fixing the amount thereof should have been made immediately thereafter, this was not done until 1924, and in the meantime, namely, April, 1922, the legislature had repealed the inheritance tax law

then in force and enacted a new one, chapters 26 and 26-A, Session Laws of 1922, in which it provided (section 30) that after the repeal became effective the "procedure in all tax matters arising under this section shall be as near as may be in accord with the provisions" thereof. The appraisal of the property for fixing the tax is, appellants argue, procedural and in view of the language of section 13 of this chapter, they contend that it should have been made as of the date of the transfer. This section requires the superior court, when necessary, to "appoint a competent person as special appraiser to fix the fair market value at the time of the transfer thereof of the property of persons whose estate shall be subject to the payment of any tax imposed by this act." The tax on the property in question, however, had accrued more than two years prior to the passage of this act, and under the provisions of paragraphs 5554 and 5560, Civil Code, 1913, the repeal of the old law did not "affect any right, then already existing or accrued at the time of such repeal." *In re Hubbs,* 31 Ariz. 252, 252 Pac. 515. It was not merely the right to the tax itself that had accrued but the right to the amount due on the property as of the date of the death of the grantor, and the use of the value upon any other date as a basis for the tax finds no justification in the statute.

The last proposition we consider relates to the admission of certain testimony. The mine went into the possession of the corporation at the termination of the life estate of Thomas Higgins in March, 1920, and was operated by it until October of that year, when, due to the fall in the price of copper, it was closed down. In July, 1922, the corporation sold it to the Phelps-Dodge Corporation for $1,250,000, the last installment of which was paid by February, 1924. To show its value in March, 1920, evidence of this

sale was introduced over the objection of appellants, and it is clear from the record that the court based its finding as to the value of the mine at that time very largely on the fact that the Phelps-Dodge Corporation agreed to pay that price for it more than two years later. Under the provisions of paragraph 5016, *supra,* the mine should have been appraised immediately upon the death of Thomas Higgins, or as soon thereafter as was practicable; hence, in arriving at its value as of that date only facts then in existence should have been received in evidence. Transactions that occurred more than two years subsequent thereto, even if otherwise admissible, had no place in the record. The rule governing officers of the counties of the state in assessing property for general taxation purposes which limits them in making the assessment to evidence in existence and usable at the time the assessment is made, should also guide those who make appraisals of property as a basis for an inheritance tax, though it is not required that their interpretation of such evidence lead to the same result. In announcing this rule in *State Tax Commission et al.* v. *United Verde Extension Min. Co.,* 39 Ariz. 136, 4 Pac. (2d) 395, the court, speaking through Mr. Justice LOCKWOOD, said:

"The question then arises whether, if an appeal is taken to the superior court, as provided in section 3065, *supra,* the court is confined in determining value to evidence as it existed as of the date of the assessment, or whether it may take into consideration other facts not then existing or known, in determining the true value as of the prior date.

"We are of the opinion that the trial court is limited in determining the true value to evidence which was in existence at the time the assessment was made. This does not mean, of course, that it can only avail itself of the information actually known to or used by the assessing body, but it must be information which was in existence and relevant, and

which could have been used if the assessing body had had knowledge thereof, and a desire to use it, and the result must be a reasonable inference from such existing and relevant evidence only. Any other rule would give rise to uncertainty and be provocative of litigation.''

The record contains many pages of testimony dealing with the value of the mine, both in 1917 and 1920, as well as later, but since it is clear that the court relied so largely upon evidence of the sale in question in arriving at the value it placed on the mine as a basis for the inheritance tax and since the other testimony relative to its value is not such that this court can ascertain from it what the true value was, it becomes necessary to reverse the judgment and remand the proceeding to the superior court of Cochise county with instruction to redetermine the value of the Higgins Mine as of the date of March 15, 1920, and to render the judgment that valuation calls for. Such will be the order of the court.

Appellants base two assignments upon the contention that the order determining an inheritance tax to be due on the transfer of the mine is in contravention, first, of the due process clause of both the federal and state Constitutions, and, second, of the clause forbidding the impairment of the obligations of a contract (Const. U. S., art. 1, § 10, and Amend. 14; Const. Ariz., art. 2, §§ 4, 25). Neither assignment, however, is argued and we, therefore, take it that both are waived and call for no consideration from us in disposing of the appeal.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with the foregoing views.

ROSS, C. J., and LOCKWOOD, J., concur.